CARRIGER *et als. v.* MAYOR AND ALDERMEN OF MOR-
RISTOWN *et als.*

MUNICIPAL BONDS. · *Election. Irregularities in the election or mode of issu-
ance do not affect validity.* Bonds issued by a municipal corporation,
under an·act of the Legislature which authorizes their issuance, if
upon an ordinance of the municipal board submitted to a vote of the
qualified voters at an election held under the direction of the board,
a majority of those voting should not decide against the proposition,
are valid, if an ordinance, although loosely worded, is passed in favor
of the·issuance, and the board find that an election was held and a
majority of the votes cast was in favor of the issuance, and their valid-
ity will not be affected by irregularities in the election or the mode
of issuance.

### FROM HAMBLEN.

Appeal from the Chancery Court at Morristown.
H. C. SMITH, Ch.

SHIELDS, HODGES & BARTON for complainants.

ROGAN for defendants. .

COOPER, J., delivered the opinion of the court.

Bill filed on the 15th of September, 1876, by seven
tax payers of Morristown against the Mayor and Al-
dermen of the town and five individuals, holders of
bonds of the corporation, to test the validity of the
bonds held by them. These bonds were part of 144
bonds of $100 each, executed in the corporate name
and issued by the municipal authorities during the
years 1868, 1869 and 1870. They were coupon bonds

in the ordinary form, purporting on their face to be "authorized by special act of the Legislature of March 14, 1868," having ten years to run from the date of issuance, and bearing interest at the rate of six per cent. per annum, payable semi-annually. Both bonds and coupons were made payable •in .Morristown. The bonds had been regularly issued at different times during the years mentioned, under separate ordinances or orders of the Board of Mayor and Aldermen, specifying the purposes or consideration, and were uniformly treated by the municipal authorities as valid. Provision was made each year for the payment of interest, and the coupons received for taxes. During the years 1874 and 1875 a special tax was laid and collected to meet the interest, and, on the 14th of March, 1876, an ordinance was passed creating a sinking fund to pay the bonds as they matured. A portion of the bonds had been issued and used at a price below what the corporate authorities had, by resolution, fixed as the selling price, upon the written application of forty-one property holders, representing, according to some witnesses, one-half, according to others three-fourths, and according to others still, seven or eight-tenths of the improved property of the town. The object of their issuance was the improvement of the public streets, the importance, if not necessity of which, is distinctly established by the evidence. Up to the filing of the bill the bonds had been treated by the citizens of the town and surrounding country as valid, and dealt in as legal securities. Under these circumstances it is obvious that the bill can only be main-

tained, if at all, upon the ground that the bonds were void in their inception. This is the position sought to ·be maintained, their invalidity being rested upon an alleged want of a sufficient ordinance submitting the proposition of their issuance to a vote of the people, as required by the statute under which they purport to be authorized, and the want of a legal election.

The first section of the act of March 14, 1868, ch. 102, reads thus: " That the Board of Mayor and ·Aldermen [of Morristown] shall have power, for the purpose of making any public improvement that may be deemed necessary for the town, or of acquiring any property for the public use of the town, to issue the bonds of the corporation, bearing interest not to exceed six per cent. per annum, and having · not more than twenty years to run; but this authority shall not be exercised unless the ordinance authorizing the same shall first be submitted to the vote of the qualified voters of the corporation, at an election to be held under the direction of said board for that purpose, and after giving ten days notice of the time and place of election by written notices, posted at four public places within the corporation, and if a majority of those voting decide against the proposition, the bonds shall not be issued."

At a meeting of the Board of Mayor and Aldermen of Morristown, held on the 1st of May, 1868, the following resolutions were passed:

"*Resolved,* by the Mayor and Aldermen of said corporation, that the Mayor be, and is hereby fully au-

thorized to employ an agent for said corporation to have two hundred bonds of said corporation struck off in good style in New York, of the denomination of one hundred dollars each, bearing six per cent interest, and running ten years, the interest to be paid semi-annually at some designated bank in New York City; and that he be further authorized to procure a seal for the use of the corporation.

"*Resolved, furthermore,* that notice be given to the qualified voters of the corporation, as required by act of the Legislature, passed March 14, 1868."

On the 20th of May, 1868, at a meeting of the Board of Mayor and Aldermen, the following proceeding was had:

"Whereas, the election returns now before the board show that the law of March 14, 1868, passed by the Legislature, was fully complied with, and that the votes cast at said election on the 13th inst., at the Mayor's office, were unanimously cast in favor of the bonds of the corporation of Morristown, Tenn., being issued in accordance with said law; therefore, be it

"*Resolved, by the Board,* That the Mayor and Recorder be, and are hereby, authorized to sign and seal as many bonds as the board may, from time to time, deem necessary."

Placed thus in juxtaposition, and read together, the law and the two ordinances seem to form a connected chain, the meaning and intent of which are plain enough. The act of the Legislature, as the evidence shows, was drawn by the Mayor of the corporation, and sent to the Legislature to obtain authority to is-

Carriger *v.* Mayor.

sue corporate bonds. As soon as the act had passed into a law, the Board of Mayor and Aldermen meet and empower the Mayor to secure the striking off of a definite number of bonds within the purview of the statute, and direct that notice be given as required by the act for taking the sense of the qualified voters as to the issuance of the bonds. And on the 20th day of the same month the board again meet, and declare that an election has been held in strict compliance with the act, at the Mayor's office, and that the votes cast were unanimously in favor of the issuance of the bonds, and authorizing the Mayor and Recorder to sign and seal bonds as the board may, from time to time, direct. The entries might have been drawn up more formally, but the proceedings could not possibly have been more regular, nor the intention more distinctly disclosed. Under this conviction, at any rate, the Mayor and Aldermen proceeded deliberately to act, issuing the bonds in controversy from time to time, during three years, without any intimation that the citizens entertained a doubt of the regularity of what had been done. Obviously, there must be a very clear exposition of a fatal defect in substance, not form, to justify the courts in treating what has been thus done as utterly void.

It is argued that the election having been held when a large part of the property holders and citizens of the corporation were disfranchised by legislative acts passed by virtue of the amended Constitution of 1865, a revolutionary amendment of the fundamental law of the State worked out through a few

individuals and a minority of the popular vote, the
election should, for that reason, be declared invalid.
But there is nothing in this record to show that the
election was confined to the voters qualified by those
laws, or, at any rate, that any person excluded from
the exercise of the elective franchise by these laws
applied to vote, and that his vote was, for that rea-
son, refused. Even if the courts could go behind
the acts of the political power and enquire into the
validity of constitutional amendments, they cannot be
required so to do except upon proceedings directly in-
stituted for the purpose, and by some person or per-
sons whose legal rights have been wrongfully inter-
ferred with. An election cannot be attacked collat-
erally, and upon abstract points of constitutional law.
The election in question, by the express terms of the
statute under which it was held, was made to depend
upon the votes of a "majority of those voting." If
the taxpayers and citizens did not choose to vote, or
to test the point of their right to vote, the election
was unexceptionably valid. *Louisville & Nashville R.
R. Co.* v. *The County Court of Davidson*, 1 Sneed, 637.
The evidence does not establish any specific irregularity
in the election of the 13th of May, 1868, much less
does it bring home knowledge of such irregularity to
any of the individual defendants who are holders of
the bonds sought to be impeached. Nor if it did,
would the fact be of any avail. The Mayor and
Aldermen of the corporation were, by the statute, made
the judges of the validity of the election, and this
judgment they have given, and entered upon their

minutes in the clearest and most unequivocal language. Whatever rights the citizens · may have had to test the validity of this judgment by proceedings promptly instituted for that express purpose before the issuance of the bonds, those rights, under the decisions of the Supreme Court of the United States and of this court, were lost after the bonds were issued for value, and passed into the hands of innocent holders in due course of trade.

But the argument most relied on and pressed with earnestness and learning by the eminent counsel of the complainants is, that the ordinance of the 1st of May, 1868, is not an ordinance to take the sense of the voters as to the issuance of bonds under the statute, but only to ascertain their wishes as to the · propriety of employing an agent to be sent to New York to have bonds struck off, and to procure a corporate seal. Such an election would, however, have been without authority and without meaning. And the argument would require the court to follow the letter at the expense of the spirit of what was done; to stick in the bark instead of going to the core. Nay, more, the court must actually shut its eyes to what the ordinance expressly declares, namely, that notice shall be given to the voters of the corporation " as required by act of the Legislature, passed March 14, 1868." That act authorizes the board to issue bonds provided the ordinance is first submitted to the qualified voters and approved by a majority of those voting. The ordinance, in addition to authorizing the Mayor to employ an agent to have bonds struck off

and to procure a corporate seal, fairly means that it is the sense of the board that the bonds thus "struck off," the number, denomination, time of running, and rate of interest being given, shall be issued, provided the popular vote shall approve the issuance. The entry, as before said, might have been more formal, and brought out more explicitly its main object, yet that object is sufficiently certain. To ignore the object and look only to the incidents would be, I think, contrary to the whole current of modern authority, and to the uniform course of decision of this court. A grant of the State, says an eminent judge, shall not fail if we can "spell out" its meaning, no matter with what difficulty; *a fortiori* of an ordinance plainly intended for a specific purpose, if there be enough on its face to disclose that intent.

It is said that the bonds authorized to be struck off were to have the interest made payable at some designated bank in New York City, while the bonds in controversy have their interest coupons payable at the treasurer's office in Morristown. But the proposition to be submitted to the people was, according to the statute, the issuance of bonds. The place at which the interest should be made payable was a matter of detail for the board, not the people. *Ross* v. *Anderson county,* MS.

The bill raises no question of usury as against the individual defendants touching the bonds held by them, even if such a point could be made in relation to such securities and by the complainants. *Doak* v. *Snapp,* 1 Col., 180; *Cromwell* v. *County of Sack,* 96 U. S., 51.

TURNEY, J., delivered the following dissenting opinion:

On the 14th of March, 1868, the Legislature of the State, then in session, undertook to amend the charter of the town of Morristown in the following language:

"Be it enacted by the General Assembly of the State of Tennessee, that the Board of Mayor and Aldermen shall have power, for the purpose of making any public improvement that may be deemed necessary for the town, or of acquiring any property for the public use of the town, to issue the bonds of the corporation, bearing interest not to exceed six per cent. per annum, and having not more than twenty years to run; but this authority shall not be exercised unless the ordinance authorizing the same first be submitted to the vote of the qualified voters of the corporation at an election to be held under the direction of said board for that purpose, and after giving ten days notice of the time and place of election by written notices, posted at four public places within the corporation; and if a majority of those voting decide against the proposition, the bonds shall not be issued."

On the 1st of May, 1868, the board passed the following resolution, viz:

"Resolved, by the Mayor and Aldermen of said corporation, that the Mayor be and he is hereby fully authorized to employ an agent for said corporation to have two hundred bonds of said corporation struck off in good style in New York, of the denomination of

one hundred dollars each, bearing six per cent. interest, and running ten years, the interest to be paid semi-annually *at some designated bank in New York City;* and that he be further authorized to procure a seal for the use of the corporation.

"*Resolved, furthermore,* that notice be given to the qualified voters of the corporation, as required by act of Legislature, passed March 14, 1868.

      "Signed,               John Murphy,

"M. R. Murrell,                 Mayor.

      "Recorder and Treasurer."

On May 20, 1868, the board again met and recorded on their minute book the following:

"Whereas, the election returns now before the board show that the law of March 14, 1868, passed by the Legislature, was fully complied with, and that the votes cast at said election on the 13th inst. at the Mayor's office, were unanimously cast in favor of the bonds of the corporation at Morristown, same being issued in accordance with said law; therefore, be it

"*Resolved,* that the Mayor and Recorder be and are hereby fully authorized to sign and seal as many bonds as the board may from time to time deem necessary."

Subsequently and at different times the Board issued one hundred and forty-four bonds, each for one hundred dollars, and payable *at the treasurer's office in Morristown.*

The bill is filed to enjoin the collection of and to declare the bonds void. In the progress of the cause the deposition of John Murphy, who was the

Mayor at the time of the action of the board upon the subject of bonds, who evidently conducted the election of the 13th of May, and who says he is draftsman of the amendment of the 14th of March, 1868, was taken. He says that "at the election at the Mayor's office on the 13th of May, 1868, a majority of those voting were not negroes as alleged, but on the contrary were white male citizens of 21 years of age, and who had so conducted themselves during the late unpleasantness that they were entitled to vote under the franchise law. There were about forty-five legal white voters, and eight or ten colored, and about eighty-five or ninety disfranchised property owners residing here then."

Complainants insist, first, that the disfranchising acts of June 5, 1865, and of May 3, 1866, were enforced at the election of May 13, 1868, and that the exclusion of a large majority of the voters and tax payers from voting rendered the election void, the acts of June, 1865, and May, 1866, being unconstitutional and void. Second, that no ordinance, as required by the amended charter, for the issuance of bonds was ever passed, and of course none was ever submitted to a vote of the people.

In support of the first position, art. 4 sec. 1 and art. 11 sec. 3 of the Constitution of 1834 are cited and relied on. The first declares "that every free white man of the age of twenty-one years . . . shall be entitled to vote." The second provides the mode of amending the Constitution.

The convention of the 9th of January, 1865, was

called by five citizens of the State, styling themselves "the executive committee of Middle Tennessee." The convention met, and amongst other things proposed as an "alteration or amendment to the Constitution," (by sec. 9 of the schedule) that "the qualification of voters and the limitations of the elective franchise may be determined by the General Assembly, which shall first assemble under the amended Constitution."

The military Governor of the State, on the 25th day of February, announced that although complete returns had not been made as provided, yet the articles amendatory of the Constitution of the State and the schedule thereto appended had been adopted by the people. Under the authority of the 9th section of the schedule, the Legislature passed the disfranchising statutes of 1865 and 1866. It is very clear that in these several proceedings neither the convention nor Legislature observed the ordinances of the Constitution.

While, perhaps, the military power in possession and control of territory may make such laws as it may deem necessary for the government of that territory during its occupation, it is certain that when peace is restored such laws cease to operate and are abrogated *ipso facto.* So that, while in the opinion of the writer there was no legal authority for the call of the convention or its action, and as a consequence, that the disfranchising acts were absolutely void, yet, however this may be, it is clear these laws were not in lawful force at the date of the amendment of the charter of the corporation of Morristown,

Carriger v. Mayor.

and the term "qualified voters," as used in that amendment, did, in legal contemplation, have no reference to said laws, which, if they ever had a legal existence, were then nullities upon the statute book. The reason ceasing, the law itself ceased.

It is argued for defendants that, disregarding the schedule of 1865, the act amending the charter of Morristown may be sustained under the Constitution of 1834, and the election of May 13, 1868, held to be regular and valid. This position is met in the fact that the qualification of voters prescribed by the disfranchising acts was strictly enforced, as appears from the testimony of Murphy, already alluded to, and substantially admitted in the answers, and that at least two-thirds of the citizens entitled to vote were deprived of that privilege. These disfranchise acts were, in my opinion, unconstitutional, because in substance bills of attainder as well as *post facto* legislation. And when the question is presented directly, as I take it to be in this case, the courts must pass upon it or the country is without relief, a condition not recognized by law. The responsibility is one the courts cannot escape by resort to technicality. Aside from these questions the one recurs, was there an election such as contemplated by the act of amendment? Was there an ordinance authorizing the issuance of bonds submitted to the vote of the qualified voters of the corporation? There was no meeting of the board between the first and twentieth days of May, and as we have seen the only business done by the board on the first of May was the adoption of

resolutions, first, to authorize the Mayor to employ an agent to have bonds struck off in New York, payable in New York. Second, that he be authorized to procure a seal for the use of the corporation. Third, that notice be given to the qualified voters of the corporation, as required by the act of March 14, 1868. There is not to be found on the minutes of the books of the corporation any other or further authority for the holding of an election, if by any rule the third resolution may be construed an order for an election. If, however, it may be so interpreted, the question is, for what? The answer is, solely upon the proposition to have the bonds struck off, and the procurement of a seal, as resolved, and for no other. So that if an election was held it only authorized the action of the board to the extent indicated in the resolutions, and could not, by any possibility, authorize the issuance of bonds, or if it may be construed to authorize the issuance of bonds, it must be held to apply to bonds payable in New York City as prescribed in what is claimed to be an ordinance, and not bonds payable at the Treasurer's office in Morristown, or on the bonds actually issued. Upon this state of facts it falls out that there is nothing of which to predicate the idea of an election as to the bonds issued, or that there was in truth any election involving the issuance of any bonds, or that the amended charter has been conformed to in any particular.

The fact that citizens have, on a few occasions, petitioned the board to issue bonds, or that the cor-

porate authorities have received coupons in payment of taxes, do not make that valid and binding which was void in the beginning. *Barnard* v. *Hawkins County*, M.S., by McFarland, J., June, 1876, in which opinion the court further says, "The question was not submitted to a vote of the people as required by the general laws, the County Court made no order authorizing the subscription of stock—in fact took no action in the matter so far as appears of record on the minute books. The people can only act through their officers and agents, but these officers and agents can only bind them when they act within the sphere defined and established by law."

It is, to my mind, clear beyond question that not only no election upon the question of the issuance of bonds was ever held, but also that no ordinance in any wise or in the least pertaining to their issuance, was ever passed so as to authorize an election. The only ordinance submitted was the ordinance to employ an agent to have blanks printed in New York. It is also clear that the recitals of the 20th of May, that an election had been held as required by the statute, is not only untrue in fact, but was fraudulently made, the officers having full knowledge of all the facts.

The argument that this recital is conclusive is untenable. Such a rule would enable the officers of municipal corporations to issue bonds to any extent, regardless of the knowledge and wishes of the people and tax payers. Innumerable frauds, with their oppressions and ruin, would be perpetrated and inflicted

17

without the means of prevention or redress.   Without authority from the Legislature there is no authority in the officers of the corporation to issue the bonds, and this being so, as is admitted on all sides, it must necessarily follow that such delegated power must be strictly pursued in all and each of its material requirements, and unless it is so observed the acts claimed to have been done under it are void.   If we depart from this rule, rigid as it may seem, and as I admit it to be, and as I hold it should be, and say that recitals upon minute or ordinance books of corporation are conclusive of the facts recited, we place the citizen and tax payer wholly and conclusively in the power of the corporate officers.   So that if there be an act of the General Assembly authorizing such officials, upon first performing certain acts of giving notice to the people, and submitting to them prescribed ordinances for their ratification or rejection, all that will be necessary will be that such officers meet in most solemn secrecy and record that such things have been done as the law required should be done, and although nothing has been done as required, still the people and the courts are estopped to inquire into and expose the fraud.

If the course of decision in the National Tribunal has been in a direction contrary to these views, we are not bound to follow, and should not do so; we are construing an act of our State Legislature, and ought to give to it the construction intended by its makers; it is an act conferring a power that did not and could not otherwise exist, an act directly affecting

the rights and property of the people, and providing
in terms on its face that it can only be operative
after the people have passed upon the ordinances en-
acted under it; it must, therefore, be strictly construed
giving effect to all its parts and to each word its
meaning as intended by the Legislature. If we may
depart from one provision of the statute, we may for
like reason and in like manner depart from another
and all of its provisions.

In this case we have some of the consequences of
such departure, for the act, in positive language, re-
stricts the issuance of bonds to purposes of improve-
ment and the acquisition of property for the corpora-
tion, yet we see the very organization which drafted
the act and procured its passage issuing bonds and
with them paying debts of the corporation created be-
fore the existence of the law, and giving two dollars
of the new bonds for one dollar of the antecedent
debts—a palpable fraud.

If the question was one of that class in which the
decisions of the United States Supreme Court were bind-
ing, I would follow them, whatever my views of their
soundness and propriety might be. But as already
seen, the question is one of construction of a statute
of our State, involving no question under the Consti-
tution of the United States. Indeed, upon the con-
struction of a State statute, the well settled rule is,
the construction by the State court must prevail.

In none of the cases cited, however, by the de-
fendants, have the courts gone to the extent of hold-
ing bonds to be valid where there is nothing except

their faces showing them to have been properly issued, and all other facts against their validity.

For these reasons I think the decree of the Chancellor should be affirmed.